

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TARA MCALEESE )
)
        Plaintiff, )
)    No. 06 C 6279
vs. )
)    Magistrate Judge Schenkier
LINDA S. MCMAHON, )
)
        Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Tara McAleese, seeks judicial review of a final decision denying her application for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 405(g). On June 23, 2003, Ms. McAleese applied for SSI due to learning problems, anxiety, depression, and attention deficit disorder with an onset date of November 16, 1987 (R. 161-163). The Social Security Administration denied the claim initially and on reconsideration (R. 76-79, 81-83). Plaintiff's subsequent request for a hearing was granted, and a hearing took place before Administrative Law Judge ("ALJ") Paul Armstrong on May 4, 2005 (R. 33). Both Ms. McAleese and a Vocational Expert ("VE") testified regarding her condition, and Ms. McAleese was represented by counsel. *Id.* On June 22, 2005 Ms. McAleese's claim was again denied by the ALJ in a written decision (R. 21-32). Plaintiff then filed a timely request for review of the hearing decision before the Social Security Administration Appeals Council, but this request was denied, making the ALJ's decision the final decision of the Commissioner (R. 5-9, 348-51).

---

[1] On February 27, 2007, the Executive Committee reassigned this case for all further proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 626(c) and full consent of all parties.

Plaintiff now appeals to this Court. The parties have filed cross motions for summary judgment: Ms. McAleese seeks a judgment reversing or remanding the ALJ's denial of her claim (doc. # 21). The Commissioner seeks a judgment affirming the decision (doc. # 34). For the reasons set forth below, the Court denies the plaintiff's motion for summary judgment and grants the Commissioner's motion for summary judgment, thereby affirming the ALJ's decision to deny benefits.

I.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court first discusses Ms. McAleese's personal and medical history. The Court then summarizes the hearing transcript and the ALJ's written decision.

A.

Ms. McAleese was born on November 16, 1972, making her thirty-two years old at the time of the ALJ's decision (R. 161). She is single and has three children, none of whom remain under her care (R. 55, 272). Ms. McAleese has obtained a GED, and her prior experience includes working as a cashier at a pharmacy, a cashier at a fast food restaurant, an usher, a cashier and stocker at a thrift store, and a housekeeper (R. 55, 177-178, 187-194).

Ms. McAleese alleges that she became disabled on November 16, 1987 (R. 25). However, since retroactive SSI benefits are not available, her claim for disability payments began on the application date of June 23, 2003 (*Id.*).

Ms. McAleese was hospitalized for severe depression with suicidal thoughts in 1988, at age fifteen (R. 286). Her next recorded hospitalization, in July of 2001, was due to a left kidney stone (R. 26). She received pain medication and treatment at the Cook County Hospital (*Id.*). At that time,

2

Ms. McAleese reported rehabilitation for cocaine and alcohol abuse, in addition to listing Paxil as a medication and a history of depression (*Id.*). Shortly thereafter, in August 2001, Ms. McAleese underwent a ureteral stone removal (*Id.*).

During rehabilitation in November 2001, Ms. McAleese was referred to Cook County Hospital for anxiety and stomach pain (R. 214). She stated that she had not been able to complete treatment at the Brass Foundation, a substance abuse clinic located in Chicago (R. 26). The hospital's initial evaluation described a history of substance abuse, in addition to past sexual abuse leading to post-traumatic stress disorder ("PTSD") (*Id.*). Ms. McAleese was prescribed psychotropic medications and referred for further treatment (*Id.*, R. 216).

In May 2003, Ms. McAleese checked herself into a substance abuse clinic for an eighty-hour relapse prevention program (R. 280-85). On May 26, the clinic referred her to the Hennepin County Medical Center in Minneapolis (R. 26). Ms. McAleese reported depression and a suicide attempt by overdose of cocaine a few years earlier (R. 265). She admitted to using crack cocaine over a four-year period and stated her last use had been five days earlier (*Id.*). Apparently, Ms. McAleese had not used cocaine for one-and-one-half years, but had relapsed in January 2003 (*Id.*). During that period, she reported using crack cocaine at a cost of $60 to $80 per day (R. 272). At the end of the program, she was diagnosed with mood and drug-related disorders and placed on psychotropic medications (R. 266). A report of a physician examination of Ms. McAleese's mental status indicated she exhibited a depressed and anxious mood, but normal concentration, thought processes and speech, and adequate judgment and insight (R. 265). During a follow-up appointment on June 11, 2003, Ms. McAleese's mental status examination was "normal" except for an anxious mood, and she was released with a recommendation to follow up (R. 268).

3

On July 23, 2003, Ms. McAleese followed up with examining physician Dimetrius Ferrell (R. 26). Ms. McAleese stated that she had not experienced hallucinations other than three years earlier when she was "coming down off cocaine" (R. 26). During the examination, Ms. McAleese alleged problems with following directions in her previous job (*Id.*). Dr. Ferrell noted symptoms of attention deficit hyperactivity disorder ("ADHD") and possible bi-polar disorder (R. 327). Dr. Ferrell gave Ms. McAleese a Global Assessment of Functioning ("GAF") score of 61 (*Id.*). According to the American Psychiatric Association, the GAF scale rates "overall psychological functioning" on a scale of 0 to 100, with a score of 100 indicating "superior functioning." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A score of 61 indicates "some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, [with] some meaningful personal relationships." *Id.* Dr. Ferrell recommended psychiatric and physical examinations, noting that Ms. McAleese indicated a desire to "learn more about her illness, resolve issues related to abuse, and enhance her independent living capacity" (*Id.*).

Two days later, on July 25, 2003, Ms. McAleese was examined by Dr. Ngozi Wamuo. During that meeting, Ms. McAleese explained attempting suicide in March 2003 by "purposely doing drugs and getting herself into dangerous situations in places where she could be killed" (R. 26, 323). Dr. Wamuo diagnosed her with major depressive disorder that was moderate and recurrent and PTSD, but he found her to be "alert, oriented[,]" and "goal-directed" (R. 323). Dr. Wamuo also described plaintiff as coherent and regular in speech, goal-directed, well-organized in her thoughts, and without suicidal or homicidal thoughts or psychotic or manic symptoms (R. 323). Dr. Wamuo

stated that Ms. McAleese's psychomotor activity was within normal limits, she had good eye contact, and was pleasant and cooperative (R. 324).

State physician Dr. Alford Karayusuf examined Ms. McAleese on September 4, 2003. At that time, Ms. McAleese reported complete sobriety since May 2003, listing Wellbutrin and Trazodone as current medications (R. 286). She was not taking mood stabilizers (*Id.*). Ms. McAleese reported adequate daily functioning, but lesser social functioning (R. 287). She complained of panic attacks, depressive thoughts, and auditory hallucinations of her name (R. 286-87). She also reported decreased concentration and memory, as well as an inability to follow directions and to perform multiple tasks (*Id.*). Dr. Karayusuf described Ms. McAleese's intelligence as "dull normal," and her insight as "nil" (R. 287). He said that plaintiff exhibited a flat affect, but maintained good eye contact and coherent speech, and was polite – albeit subdued, anxious looking and moderately depressed in mood (*Id.*). Dr. Karayusuf diagnosed Ms. McAleese with cocaine remission, bipolar disorder, and depression (R. 287). He concluded that Ms. McAleese was able to understand, retain, and follow simple instructions (R. 288). In terms of employment functionality, Dr. Karayusuf concluded that she would be able to "maintain pace and persistence" in the context of simple routine tasks with brief, superficial interactions with fellow workers, supervisors, and the public (*Id.*).

During the same month, Ms. McAleese's mental condition was assessed by Dr. Dan Larson, a state agency physician who reviewed her treatment records. Assessing the claimant's mental limitations and substance abuse problems, Dr. Larson concluded that she had mild limitations in her daily living activity and moderate limitations in social functioning and in maintaining concentration, persistence, and pace (R. 297, 299). Dr. Larson further specified that Ms. McAleese could perform

5

routine, repetitive tasks, limited to brief and superficial contact with supervisors and co-workers (R. 303- 305). He concluded that she was able to handle stress in a routine, repetitive work setting (R. 305). These findings were reviewed and affirmed in October 2003 by Dr. Ray Conroe (R. 289, 304).

In November 2003, Ms. McAleese saw Dr. Wamuo and reported some improvement in her depression, but also complained of increased hallucinations and paranoia (R. 318). Dr. Wamuo prescribed Risperdal for Ms. McAleese (*Id.*). Dr. Wamuo described Ms. McAleese as initially pleasant and cooperative, but then as tearful when she discussed her life situation (in particular, her inability to communicate with her family because she did not "feel ready" to do so) (R. 318).

After this appointment, Dr. Wamuo did not see Ms. McAleese again for nearly one year. During her next appointment with Dr. Wamuo in October 2004, Ms. McAleese reported taking Effexor, which had helped her mood and kept her more focused and aware (R. 317). She reported improved sleeping and appetite (R. 317). Dr. Wamuo reported that Ms. McAleese showed good judgment and insight, had a "stressed" mood but no cognitive difficulties, a normal speech pattern, and was "pleasant and cooperative" (*Id.*).

Ms. McAleese relapsed into cocaine abuse with a nine-day binge in November 2004, during which she consumed $100 worth of crack per day (R. 27, 328-29). She was hospitalized with suicide ideation and given a GAF score of 25 (*Id.*). A score of 25 indicates behavior "considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, . . . or inability to function in almost all areas." Diagnostic and Statistical Manual, *supra*, at 34. Ms. McAleese was diagnosed with chemical dependency and referred for further treatment (*Id.*, R. 328). Ms. McAleese's case manager, Jeanne Johnson, stated that as of April 20, 2005, Ms. McAleese had been sober for five months (*Id.*, R. 340). Also in April 2005, Dr. Wamuo filled out a state welfare

6

agency form, checking a box to indicate that Ms. McAleese would not be able to perform any job in the foreseeable future, and that she suffered from mental illness and chemical dependency (cocaine dependence in remission) (R. 332). He also checked a box indicating that Ms. McAleese would still be disabled even if she were to cease cocaine use (*Id.*). The record does not indicate that Dr. Wamuo saw Ms. McAleese in April 2005, or at any time between October 2004 and April 2005.

## B.

At the administrative hearing on May 4, 2005, Ms. McAleese appeared and testified, represented by counsel. She stated her intent to "stay clean" from cocaine and asserted that she was taking her recovery "one day at a time" (R. 44). Ms. McAleese stated that she "had to focus on her [drug] recovery" because she understood that she had to "be able to stay clean in order to . . . [be] functional" (R. 46). She admitted that she had not attempted to find employment since her last attempt to stop using cocaine (R. 38). Ms. McAleese related that Dr. Wamuo instructed her not to seek employment (*Id.*).[2] Ms. McAleese suggested that she would be able to perform volunteer work and "be around people," but she would not be able to focus on more than one thing at a time (R. 47, 48). Her main focus at the time of the hearing was recovery, considering that she had been using cocaine for seven years and was still in the early recovery stage (*Id.*).

Ms. McAleese claimed that she has had a mental illness since she was young, and that her mother and sister also suffer from mental illness (R. 45). She testified that her depression makes her not want to do anything, and that she is "not sleeping right" (R. 50). Her PTSD affects her in the form of nightmares, so that she does not feel well rested (*Id.*). Ms. McAleese testified that she has

---

[2] We were unable to confirm such a direction from Dr. Wamuo in the record, unless Ms. McAleese was referring to the form Dr. Wamuo filled out in April 2005 indicating that Ms. McAleese would not be able to perform employment in the foreseeable future (R. 332).

7

crying spells and anxiety attacks when she feels overwhelmed, but she was unable to explain how often these occurred (R. 51). Ms. McAleese could not answer whether these attacks happened daily, weekly, or monthly (*Id.*). She testified that her psychotropic medications caused hair loss, but no other side effects (R. 52). She also said that although the drugs made her feel "numb," she needed them to be functional (*Id.*).

Ms. McAleese stated that before her cocaine relapse in November 2004, she was working part time as a housekeeper and living in a shelter with her daughter (R. 52). Although she had lost custody of her younger children in 2001, her oldest daughter had stayed with her (R. 55). Immediately before her cocaine binge and subsequent treatment program in November 2004, Ms. McAleese was employed part-time cleaning apartments and using cocaine (R. 53). She was working four hours a day and testified that she began using cocaine with a man that lived in one of the apartments she cleaned (*Id.*). This use triggered a nine-day binge, at which point she began a substance abuse program (R. 54). Her oldest daughter moved in with her grandmother (R. 55).

Ms. McAleese testified that she "want[s] to work" (R. 45). She had tried to work in the past, but testified that she "cannot concentrate" (R. 44). Ms. McAleese admitted that she does "fine" if a supervisor tells her do to one thing at a time, but she cannot handle multiple tasks (*Id.*). When asked whether she could handle a "simple job" such as cleaning an office at night, Ms. McAleese replied that she "wouldn't be able to focus on the job" (R. 49).

Ms. McAleese confirmed that her past jobs ended because she could not handle them (R. 56). The ALJ asked her whether her cocaine addiction contributed to ending any jobs besides her housekeeper position, and she responded no (*Id.*). She clarified that she "wasn't using" at her other jobs because she didn't work at any of them long enough to relapse (*Id.*). She testified that her

8

longest-running job, at a family-run pharmacy in 1998, ended because she quit after four months (R. 57). She had worked as a cashier at the pharmacy, and she explained that she quit because she "couldn't handle the job," and she did not have child care for her young children (R. 58). Ms. McAleese explained that when her supervisor gave her multiple tasks, her chest would hurt and she could not focus (*Id.*). She believed that her supervisor only kept her there because she was family (*Id.*).

The ALJ then elicited testimony from the VE. The ALJ asked the VE to state if any differences existed between his testimony and the information contained in the Dictionary of Occupational Titles ("DOT") (R. 55, 65). The VE replied that his testimony was consistent with the DOT (*Id.*). The ALJ asked Ms. McAleese to confirm that she has no physical problems, which she confirmed (R. 59). The ALJ then asked the VE to consider the vocational limitations of a hypothetical individual without physical problems, but "limited to simple, routine tasks, no more than superficial contact with supervisors, co-employees and the general public, [and] no high-stress work such as high quota assembly line type jobs" (*Id.*). The ALJ first asked the VE whether that hypothetical individual could return to any of Ms. McAleese's past relevant work. The VE responded that he would eliminate the fast food worker, but that housekeeping work was possible because "you work at your own pace" (R. 60).

The ALJ continued by asking the VE whether, assuming the housekeeper job was not past relevant work, any other jobs existed in the national economy that the hypothetical individual could perform (*Id.*). The VE responded that a retail bagger, packer, or cleaner would be suitable to the individual's limitations (*Id.*). However, the VE stated if the individual could not concentrate on the job for fifteen minutes out of every hour, she would not be employable in any of these jobs (*Id.*).

9

Further, if the individual could decompensate due to stress as much as one day per week, the VE testified that she would not be employable (R. 61). In response to a question from Ms. McAleese's counsel, the VE testified that when an individual is referred to vocational rehabilitation, job placement does not begin until a physician recommends that the individual is ready for placement (*Id.*).

After the VE testified, the ALJ stated that the was hesitant to grant benefits to someone of Ms. McAleese's age with "this kind of impairment with so much drug abuse in the past" (R. 65). He stated that he was receptive to the closing arguments of Ms. McAleese's counsel and the record, but that he saw "nothing unusual" in the reasons behind her leaving her past relevant work (R. 67). He referenced the medical record, explaining to counsel that the diagnosis from the "reviewing professional" on Ms. McAleese's mental illness was "not severe" (*Id.*). Counsel suggested that Ms. McAleese's treating physician has "made it clear" that her psychiatric problems, not her drug addiction, have made it impossible to sustain work (*Id.*). The ALJ then expressed that he was "absolutely willing" to hear what Ms. McAleese and her counsel had to say (R. 68).

## C.

The ALJ issued his decision on June 22, 2005 (R. 32). He applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.290 (2002). At Step 1, the ALJ found that Ms. McAleese had not engaged in substantial gainful activity since the alleged onset of disability (R. 31). While some evidence existed of earnings after that date, those amounts were not significant (R. 25). At Step 2, the ALJ found that Ms. McAleese had several impairments which met the "severe" standard set forth in the Regulations, including cocaine addiction, possible bi-polar disorder, and depressive posttraumatic stress disorder (R. 26).

10

Next, the ALJ performed a review under Step 3, which calls for the ALJ to determine whether the claimant's condition meets or equals an impairment listed in the Regulations as so severe that it precludes substantial gainful activity. In order to do this, the ALJ followed the special procedure set forth by 20 C.F.R. § 416.920(a) (R. 26). The ALJ initially inquired whether Ms. McAleese had any medically determinable mental impairment identified in Section 12.00 of the Listing of Impairments (Id.). In disability reports, Ms. McAleese reported anxiety attacks, panic attacks, attention deficit hyperactivity disorder, and auditory and visual hallucinations (Id.). However, she also described performing activities such as cooking, reading, watching children, and taking classes (Id.). The record showed a history of substance abuse treatment in 2000, 2001, 2003, and 2004 (Id.).

Considering Ms. McAleese's alleged impairments, the ALJ assessed her medical record, finding that her episodes of decompensation in May 2003 and November 2004 resulted from substance abuse (R. 27). This condition caused a limitation of a severity sufficient to satisfy the Regulation's listing 12.09 regarding substance abuse disorders (Id.). However, Section 105 of Public Law 104-121 states that SSI benefits cannot be paid where drug or alcohol dependency is a contributing factor "material" to the finding of disability. 20 C.F.R. § 404.1535. The key factor in determining whether drug use is a contributing, material factor to the disability determination is whether the individual would still be disabled if alcohol and drug use were stopped. 20 C.F.R. § 416.935(b). The ALJ found that during periods of sobriety, Ms. McAleese's mental symptoms were controlled by psychotropic medications (R. 28). The medical record reflected that the claimant had an "essentially normal" mental status when she was not using cocaine; despite a "depressed mood," the ALJ did not find limitations "reach[ing] listing level severity" (R. 27). Relying on this finding,

11

the ALJ concluded that her condition did not meet the requirements of the Regulation's mental impairment listings at 12.04 or 12.06 (R. 28). In sum, the ALJ found "no decompensations unrelated to substance abuse," and he concluded that the claimant's present condition did not meet or equal any Listing (*Id.*).

Before proceeding to Steps 4 and 5, the ALJ looked to the medical record to determine Ms. McAleese's residual functional capacity (RFC) absent cocaine use (R. 28). The ALJ found that Ms. McAleese possessed an RFC for "simple, routine work, no more than superficial contact with supervisors, co-employees, and the general public, and no high-stress (high quota, assembly-line type) work" (*Id.*). According to the ALJ, this RFC allows for "many of [the claimant's] subjective complaints and limitations" (*Id.*). With respect to Ms. McAleese's complaint that she is unable to perform any work activities on a sustained basis, the ALJ found that complaint to be "not fully credible" in light of the entire record (*Id.*). To support this finding, the ALJ cited the claimant's described daily activities, which were not limited "to the extent one would expect," given Ms. McAleese's alleged disabilities (*Id.*).

At Step 4, the ALJ assessed Ms. McAleese's RFC to determine whether she could perform any past relevant work. The ALJ noted the vocational expert's (VE) testimony that an individual with Ms. McAleese's limitations could return to her past relevant work as a housekeeper (R. 29, 60). Specifically, the ALJ posed a hypothetical to the VE, describing an individual with "no physical limitations, but limited to simple, routine tasks, no more than superficial contact with supervisors, co-employees, and the general public, no high-stress work such as high quota assembly line type jobs" (R. 29, 59). Based on this testimony, the ALJ "concur[red]" with the VE's opinion that Ms. McAleese could return to her past relevant work as a housekeeper (R. 29).

12

Finally, the ALJ turned to Step 5 to determine "whether or not there are a significant number of jobs in the national economy that the claimant can perform given her residual functional capacity and other vocational factors" (*Id.*). Relying on the VE's testimony, which took into account the claimant's RFC, age, educational background, and employment history, the ALJ found that Ms. McAleese would be employable in a substantial number of jobs existing in the fields of retail bagging (15,000 jobs), packing (15,000 jobs), and cleaning (70,000 jobs) (*Id.*).

### III.

To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months" 42 U.S.C. § 423(d)(1)(A) (2002). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. See 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

13

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* However, under 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

The "key factor . . . in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether [the Commissioner] would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). The ALJ and the Commissioner must "evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If a claimant's "remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).

In reviewing the Commissioner's decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner (here the ALJ). *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," which is defined as such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 333 (quotations omitted). Where

14

conflicting evidence allows reasonable minds to differ, the responsibility for determining a claimant's disability falls on the Commissioner (here the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). This Court is limited to reviewing whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992); *see also* 42 U.S.C. § 405(g). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion in the first instance. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only evidence that favors his or her ultimate decision. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the analysis must be articulated at some minimal level and must state the reason(s) for accepting or rejecting "entire lines of evidence." *Id.* The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). In particular, the ALJ must articulate specific reasons supporting a credibility determination, although a court will not overturn the ALJ's credibility determination unless it is "patently wrong." *Zurawski*, 245 F.3d at 887; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

15

**IV.**

On appeal, the claimant argues that a remand is required because the ALJ: (a) failed to properly weigh the evidence and came to an incorrect conclusion on the claimant's RFC; (b) made an improper credibility finding; (c) made a Step 5 determination unsupported by evidence; and (d) harbors a bias against awarding benefits to "younger" individuals. The Court addresses each of these arguments in turn.

**A.**

The ALJ found Ms. McAleese to be disabled, but found that her cocaine use was a contributing factor material to her disability. He formulated his RFC based on the claimant's limitations without cocaine use (R. 28). The claimant argues that the ALJ failed to give sufficient weight to the opinion of Dr. Wamuo, her treating physician (R. 322), that Ms. McAleese would be disabled even without addictive behavior (Pl.'s Mem. at 12-13). Dr. Wamuo's assessment was at odds with the opinions of Drs. Karayusuf, Larsen and Conroe that Ms. McAleese could perform a limited range of simple work (R. 288, 303-05).

An ALJ's finding of fact is proper so long as it is supported by "substantial evidence." *Ehrhart*, 969 F.2d at 538; 42 U.S.C. § 405(g). This is true even if some evidence in the record may support the claimant's position. *Walker v. Bowen*, 834 F.2d 635, 639-40, 642 (7th Cir. 1987). "[W]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (noting that the ALJ must decide which doctor to believe when weighing conflicting medical evidence). Opinions of treating physicians are not entitled to controlling weight if those opinions lack support in the record as a whole. *See, e.g., Henderson ex rel. Henderson v.*

*Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). In assessing that record, an ALJ is entitled to consider the opinions of non-treaters, including state agency consulting doctors, who "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.972(f)(2)(i); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). This Court must not re-weigh the evidence, but instead must determine whether substantial evidence supported the ALJ's decision to discount Dr. Wamuo's opinion. *See Young*, 362 F.3d at 1001.

The ALJ acknowledged that Dr. Wamuo indicated that although Ms. McAleese's cocaine dependence was in remission, she would nevertheless be unable to perform any employment in the foreseeable future (R. 28). The ALJ explained that he gave no weight to that opinion because it was unsupported by treatment notes, and that Ms. McAleese's "mental status exams have been relatively unremarkable in the absence of substance abuse" (R. 28). We find that ALJ's decision to reject Dr. Wamuo's opinion is supported by substantial evidence.

*First*, Dr. Wamuo's opinion conflicts with those of Drs. Karayusuf, Larson and Conroe, who concluded that Ms. McAleese's impairments would not prevent her from performing a limited range of jobs. "The ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

*Second*, Dr. Wamuo's opinion also conflicts with his own treatment notes, which prior to April 2005 never indicated that Ms. McAleese was unable to perform any work. In the October 2004 notes, before Ms. McAleese's November 2004 cocaine binge and after a lengthy period of no drug use, Dr. Wamuo noted that medication had improved Ms. McAleese's mood, sleeping and appetite, and that while exhibiting a "stressed" mood, she exhibited no cognitive difficulties, showed good judgment and insight, exhibited a normal speech pattern, and was pleasant and cooperative (R.

17

317). The contrast between Dr. Wamuo's October 2004 assessment, while Ms. McAleese was in remission, and the April 2005 assessment after a relapse, supports the ALJ's rejection of Dr. Wamuo's opinion in April 2005 that Ms. McAleese was disabled even without regard to cocaine dependency.

*Third*, that is particularly so because Dr. Wamuo's April 2005 opinion consists of checking boxes on a typed form, which the Seventh Circuit has recognized to have limited probative value. *See Dixon*, 270 F.3d at 1177 (ruling that the ALJ reasonably rejected treating physician's opinion as "not credible" where the physician "expressed this opinion by writing 'yes' next to a question that Dixon's attorney had pre-typed [but] did not elaborate on the basis for this opinion"). Dr. Wamuo did not explain why he concluded that Ms. McAleese was disabled without regard to cocaine dependency. Indeed, there is no evidence that Dr. Wamuo saw Ms. McAleese again after October 2004, and before preparing the April 2005 assessment. The absence of prior treatment notes to support that conclusion, along with the contrary medical evidence, provides further basis for the ALJ's finding.[3]

Plaintiff also argues that the ALJ was not entitled to reject Dr. Wamuo's opinion that Ms. McAleese was disabled, even absent any cocaine dependency, without first obtaining the opinion of a psychological consultant (Pl.'s Reply at 2-3). The sole support plaintiff offers for this assertion is SSA Emergency Teletype, No. EM-96-94 (Aug. 30, 1996) ("the Teletype"). At the outset, we note that the Teletype does not impose on the ALJ any duty to obtain a consultant's opinion on this point before rejecting the opinion of a treater. Rather, the Teletype states that there are cases when it is

---

[3]Plaintiff argues that the ALJ failed to consider her need to constantly adjust and readjust medications (Pl.'s Mem. at 12). However, that evidence does not explain why McAleese would be disabled absent cocaine dependency.

difficult to determine what limitations a person may have if drug and/or alcohol ceased. The Teletype states that when this occurs, a finding that drug or alcohol addiction is material "will be made only when the evidence establishes that the individual would not be disabled if he/she stopped using drugs/alcohol. . ."

Because the Teletype is not the product of formal agency rulemaking, it is neither binding on the agency, *Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007), nor on this Court. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Rather, an agency interpretation such as one contained in an opinion letter is not controlling when a court interprets a statute, and is "entitled to respect" only insofar as it has the "power to persuade." *Id.*; *see also Parra*, 481 F.3d at 749 (applying the *Christensen* principle to the Teletype). We note that it is the burden of a claimant to establish at Step 3 that he or she has an impairment that meets or equals a Listing. *Young*, 957 F.2d at 389. In a case such as this one, that burden requires a claimant to show that alcohol or drug dependancy is not a material factor contributing to her disability. *Parra*, 481 F.3d at 750. To the extent that the Teletype would relieve a claimant of that Step 3 burden, we find it contrary to the Social Security statute and thus unpersuasive.

Moreover, a separate portion of the Teletype, not cited by plaintiff, supports the method of analysis employed by the ALJ. The Teletype cites the following as an example of a case where "it would be appropriate to find that [drug and alcohol dependency] is a contributing factor material to the disability":

> The third example (when an individual's other impairment(s) is exacerbated by DAA and the evidence documents that, after a drug-free period of 1 month, the other impairment(s) is not disabled) was intended to illustrate the fact that, in some situations, it may not be possible to separate the effects of drug/alcohol use from the

19

affects of the other impairment(s) until the individual has been abstinent for a length of time sufficient to allow the acute effects of intoxication and withdrawal to abate.

Teletype, Issue 7. The Teletype goes on to state the "[t]he most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol." *Id.* In this case, the record disclosed substantial periods of time -- well in excess of one month -- when Ms. McAleese was not using cocaine. The ALJ specifically considered the medical evaluations of Ms. McAleese during those time periods in finding that she was not disabled when the contributing factor of cocaine dependency was eliminated from the equation. Under the guidance provided by the Teletype, this provided substantial evidence for the ALJ's finding that Ms. McAleese's cocaine dependence was a material contributing factor to her disability, and that without it she does not have a disability that meets or equals a Listing.

Finally, Ms. McAleese also argues that the ALJ erred in assessing the claimant's RFC by making a vocational distillment without incorporating the limitations he acknowledged in his findings (Pl.'s Mem. at 9). Specifically, the ALJ found that Ms. McAleese had moderate difficulties in maintaining social functioning, concentration, persistence or pace, and mild restrictions in her daily living activities (R. 28). Ms. McAleese contends that the ALJ erred by failing to incorporate these limitations into his RFC (Pl.'s Mem. at 10-11, 14-15), in which the ALJ found that Ms. McAleese would be able to perform simple, routine tasks with no more than superficial contact with supervisors, co-workers, or the public, and no high-stress work (R. 28). For the following reasons, we find that the ALJ's assessment is supported by substantial evidence.

The RFC assessment is drawn from Dr. Karayusuf's and Dr. Larson's opinions, which translated the claimant's limitations into functional restrictions (R. 288, 303-05). The ALJ adopted

20

these functional restrictions into his RFC (R. 28), and he was entitled to rely on the doctors' opinions in forming this assessment. *See Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (stating that an ALJ "reasonably relied" on a doctor's translation of limitations into an RFC assessment when formulating hypothetical questions for the VE); *see also Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir.1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record.").

Moreover, while the ALJ found that Ms. McAleese had moderate difficulties in maintaining concentration, persistence and pace (R. 28), his RFC accommodated that finding. Both Drs. Karayusuf and Larson found that Ms. McAleese had limitations in these areas, but that they could be accommodated in the RFC that the ALJ ultimately adopted. Dr. Karayusuf said that within the parameters of work that involves "brief superficial interactions with fellow workers, supervisors and the public" and that is in the context of "performing simple routine repetitive concrete tangible tasks," Ms. McAleese "is able to maintain pace and persistence" (R. 288). Similarly, Dr. Larson said that Ms. McAleese's persistence and pace would be adequate "under the right circumstances," which he defined as work that involved routine, repetitive tasks that were not detailed or complex (R. 305). Dr. Larson further opined that Ms. McAleese had sufficient concentration to remember and follow routine, repetitive instructions; to interact with others on a brief, infrequent and superficial basis; and to handle a stress level consistent with routine, repetitive work (*Id.*). Although Ms. McAleese may disagree with the ALJ's RFC determination, that determination is reserved exclusively to the Commissioner. 20 C.F.R. § 404.1527(e). Accordingly, we reject claimant's argument that the ALJ's RFC determination requires reversal.

**B.**

The claimant next argues that the ALJ made an improper credibility finding under Social Security Ruling ("SSR") 96-7p and 20 C.F.R. § 416.929 when he found that Ms. McAleese's allegations regarding her limitations "not fully credible" (Pl.'s Mem. at 15). This Court is bound to uphold an ALJ's credibility finding unless it is "patently wrong." *Zurawski*, 245 F.3d at 887. The ALJ is only required to credit the claimant's subjective complaints to the extent that they are reasonably consistent with other medical evidence in the record. *See* 20 C.F.R. § 419.929; SSR 96-7p. Because the ALJ only discounted complaints that were not consistent with the record, and because he provided reasons for that decision, his credibility determination is not patently wrong.

The ALJ credited the claimant's complaints that she has "severe impairments that cause significant limitations" on her ability to work (R. 28). However, he refused to credit her complaints "to the extent that [she] alleges an inability to perform *any* significant work activities on a sustained basis" (R. 28) (emphasis added). The ALJ explained that the claimant's complaint that she could not perform any work was inconsistent "in light of the entirety of the evidence," including the claimant's descriptions of daily activities (*Id.*). Presumably, the ALJ refers to the claimant's described activities of "cooking, reading, watching children, and taking classes," which the ALJ noted elsewhere in his opinion (R. 26). In addition, the ALJ pointed to the medical evidence of Drs. Karayusuf, Larson and Conroe as inconsistent with Ms. McAleese's statement of her inabiilty to perform any work (*Id.*). Because the ALJ gave extensive consideration to Ms. McAleese's impairments and cited to the record in declining to find one of her complaints credible, we find that the ALJ gave "specific reasons" for his credibility finding under SSR 96-7p. *See Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (finding that the ALJ gave "sufficient deference" to the

claimant's complaints where he "properly relied on objective medical and other evidence that sufficiently contradicted the credibility of Arnold's claims of disability," including expert medical testimony that Arnold was capable of performing simple, repetitive, low production, low stress work tasks, and Arnold's own disclosure of his daily work activities).

Plaintiff argues that in assessing credibility, the ALJ gave no weight to Dr. Wamuo's treatment notes (Pl.'s Mem. at 15-16). The ALJ considered the treatment notes, but rejected the opinion that Ms. McAleese could not work even apart from cocaine dependency. For reasons that we have explained above, the ALJ was entitled to reject that opinion. We, therefore, reject the argument that the ALJ erred in his credibility finding.

## C.

The claimant argues the ALJ did not provide an accurate hypothetical to the VE, and thus failed to meet the Commissioner's burden at Step 5 of demonstrating that a significant number of jobs exist in the national economy that the claimant could sustain on a regular basis (Pl.'s Mem. at 17). Again, this Court's review is limited to whether the ALJ's Step 5 finding is supported by "substantial evidence" and free from legal error. *Herron*, 19 F.3d at 333. For the following reasons, we reject this challenge to the Step 5 determination.

*First*, the claimant argues the ALJ's hypothetical failed to incorporate all of Ms. McAleese's limitations (Pl.'s Mem. at 18-19). When considering the appropriateness of a hypothetical question, "[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record." *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993) (citing *Ehrhart*, 969 F.2d at 540). The ALJ's hypothetical question posited an RFC assessment of a person with no exertional limitations, but who is limited to "simple, routine tasks, no more than superficial conduct with supervisors, co-

23

employees and the general public, no high-stress work such as high quota assembly line type jobs" (R. 59). The ALJ's hypothetical question tracks the ALJ's ultimate findings as to Ms. McAleese's RFC (*see* R.31, Finding No. 5). As we already have explained, that RFC is supported by the medical record, and in particular the opinions of Drs. Karayusuf, Larson and Conroe. Because the medical record supports the ALJ's hypothetical question, the ALJ did not err in framing the question.

*Second*, the claimant argues that the VE's response to the ALJ's hypothetical question contained jobs that did not fit the limitations set forth (Pl.'s Mem. at 19). Specifically, the claimant asserts that she cannot perform any of the jobs suggested by the VE because, under the DOT, they require that the claimant take instructions or help others (*Id.*). However, these jobs align with the limitations set forth by the RFC, which required "no more than superficial contact with supervisors" (R. 28). The DOT codes for the jobs selected by the VE have a fifth digit of "eight," meaning that the jobs may require "taking instructions" and "helping." U.S. Dept. of Labor, Employment, and Training Administration, *Appendix E of the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993). However, under the DOT definitions, code "eight" signifies jobs with the lowest possible interaction with people (*Id.*). The evidence of record allowed the ALJ to find that Ms. McAleese had some ability to interact with people, take instructions, or help. Thus, we find no inconsistency between the RFC and the DOT codes for the jobs identified by the VE at Step 5.

In addition, we note that the ALJ is entitled to rely on the VE's testimony in terms of the existence of a significant number of jobs that accommodate the claimant's limitations. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). Here, the ALJ fulfilled his obligations under SSR 00-4p by asking the VE to notify him if his testimony conflicts with DOT definitions (R. 55, 65). The VE

24

testified (correctly) that there was no inconsistency. Plaintiff's counsel failed to challenge or further probe that testimony at the hearing. "When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if the conclusion differs from the Dictionary's." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). For this reason as well, the ALJ was entitled to rely on the VE's testimony regarding the existence of jobs suitable to the claimant's limitations. We thus conclude that the ALJ did not err in either formulating the hypothetical question, or relying on the VE's response.[4]

## D.

Finally, the claimant argues that the ALJ's decision to deny benefits is erroneous because it is tainted by his bias against awarding benefits to individuals under the age of fifty (Pl.'s Mem. at 20). The claimant attempted to prove this bias by introducing numerous exhibits from sources outside the administrative record, including cases and a legal publication (*Id.*). However, this Court's review is limited strictly to the contents of the administrative record. 42 U.S.C. § 405(g); *Papendick v. Sullivan*, 969 F.2d 298, 302 (7th Cir. 1992); overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999) ("It is clear from the statute that a district court may not consider evidence outside the certified record."). Thus, the record must support evidence of the ALJ's alleged bias in order to prove error. For the following reasons, we find that the administrative record fails to show that bias improperly influenced the ALJ's decision.

---

[4]Plaintiff claims that she did raise this challenge to the jobs identified by the VE in a post-hearing brief (Pl.'s Reply at 7, citing R. 213). That brief raised the issue of customer contact as to the retail bagging job, but not the packing and cleaning jobs. In her reply, plaintiff also raises challenges to those jobs that she failed to assert in her opening brief. Arguments first raised in a reply brief are waived. *See Kauther SDN BHD v. Sternberg*, 149 F.3d 659, 668 (7th Cir. 1998). In any event, we do not find these additional challenges to the jobs identified by the VE sufficient to warrant remand.

In order to establish bias, the claimant must show that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" do not establish bias. *Id.* at 555-56; *see also Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001) (rejecting a claimant's allegations of bias in a Social Security appeal where nothing in the record "rises to [the required] level").

In this case, the claimant alleges that the ALJ's comments during the hearing evince a bias against awarding benefits to younger individuals (Pl.'s Mem. at 21). During the hearing, the ALJ expressed his hesitance at awarding benefits to young individuals with a long history of drug abuse (R. 65). He also, however, expressed a willingness to review counsel's claims, and he reiterated his focus on the medical record (R. 66-68). An ALJ is entitled to consider age when determining whether to grant or deny Social Security benefits. *See* 20 C.F.R. § 416.920(a)(4)(v) (noting that the Commissioner may assess a claimant's "age, education, and work experience"). Considering that the ALJ's RFC assessment was supported by "substantial evidence," that the ALJ's statements failed to rise to the "extreme" standard set forth by the Supreme Court, the claimant's allegations of bias fail.

## CONCLUSION

As is evident from the foregoing discussion, we affirm the ALJ' denial of disability benefits. We do so mindful of the many misfortunes that life has dealt to Ms. McAleese. Ms. McAleese plainly has had a difficult life, and we would not be surprised if she were to view this decision as one

26

more of the many hard knocks she has experienced. If sympathy for her plight were the test for an award of disability benefits, we have little doubt that Ms. McAleese would qualify.

But, sympathy is not the test. We are obliged to defer to the decision of the ALJ so long as it is supported by substantial evidence. Applying the governing legal standards, we conclude that the ALJ's decision meets that standard. Accordingly, we grant the Commissioner's motion for summary judgment affirming the ALJ's decision (doc. # 34), and we deny Ms. McAleese's motion for summary judgment seeking a remand (doc. # 21).

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: October 30, 2007**